NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARY KASTEN,<br><br>                          Plaintiff,<br><br>     v.<br><br>SHAAN ENTERPRISES, INC., t/a<br>DOMINO'S PIZZA, and JOSE LEBRON,<br>individually,<br><br>                          Defendants. | Civil Action No. 17-03262<br><br><br>**OPINION** |

**CECCHI, District Judge.**

This matter comes before the Court on the motion for summary judgment (the "Motion") (ECF No. 71) of Defendants Shaan Enterprises, Inc. ("Shaan"), Domino's Pizza ("Domino's"), and Jose Lebron ("Lebron") (collectively, "Defendants"). The Motion seeks judgment in favor of Defendants on all counts of the Complaint (ECF No. 1) ("Compl."), filed by Mary Kasten ("Plaintiff"). The Court has considered the submissions made in support of and in opposition to the instant Motion. *See* ECF Nos. 71-3, 74, 77. The Motion is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.[1] For the reasons set forth below, Defendants' Motion for summary judgment is **GRANTED in part** and **DENIED in part**.

---

[1] The Court considers any new arguments not presented by the parties to be waived. *See Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise an issue in the district court constitutes a waiver of the argument.").

I.     **BACKGROUND**

This case arises out of allegations of sexual harassment committed against Plaintiff while she worked as a delivery driver for a Domino's pizzeria store owned by Defendant Shaan.[2]   ECF No. 71-2 ¶¶ 7-29 ("Defs. SMF"); ECF No. 75 ¶¶ 7-29 ("Pl. Resp."); ECF No. 75 ¶¶ 11-16, 28-30 ("Pl. Counter SMF").[3]   Plaintiff alleges that a co-worker, Defendant Lebron, subjected her to unwelcome "egregious and disturbing sexual harassment" by using vulgar language on a specific occasion while at work.   ECF No. 74 at 3, 21.   She also contends that as a result of her employer's failure to take "prompt corrective action" in response to multiple complaints made to management, she was further harassed a second time while driving Lebron home, as she was allegedly required to do by her supervisors.   Id. at 3, 21, 29.   Lebron categorically denies engaging in any inappropriate conduct towards Plaintiff.   Pl. Counter SMF ¶ 31.   Nevertheless, Defendants assert that even assuming these comments were made by Lebron while at work, they were not "severe or pervasive" enough to create a hostile work environment under applicable law.   ECF No. 71-3 at 22-26.   Additionally, Defendants maintain that any allegations regarding the car ride were disavowed by Plaintiff at her deposition, and even if they are considered by the Court, amount only to "playful banter" to which Plaintiff "welcomed, solicited, incited and/or readily invited." Id. at 28-30.

---

[2] Unless otherwise indicated, the following facts are not in dispute and are drawn from the parties' Local Rule 56.1 statements.  If a fact is identified as in dispute, it will be additionally represented by citations to both parties' Local Rule 56.1 statements.

[3] Plaintiff responds to Defendants' Local Rule 56.1 statement and provides additional facts within the same document (ECF No. 75).  Accordingly, the section where she responds to Defendants' Local Rule 56.1 statement will be labeled "Pl. Resp." while her counter-statement will be labeled "Pl. Counter SMF."  Defendants did not respond to Plaintiff's Counter SMF, so many of the assertions made by Plaintiff in her Counter SMF appear unchallenged, but are not necessarily undisputed.

Plaintiff was hired by Shaan in December of 2015 to work at its Domino's pizzeria stores. Defs. SMF ¶ 1. Plaintiff's responsibilities included cleaning dishes, preparing food, and delivering supplies. Id. ¶ 3. While working at Shaan's Ramsey Domino's location, Plaintiff did not complain about any improper or inappropriate conduct, although Plaintiff first encountered Defendant Lebron at this location as he served as its Assistant Manager. Id. ¶¶ 8-9, 16-18. Plaintiff was later transferred to Shaan's Domino's location in Midland Park ("Midland Park Domino's") in February of 2016 shortly after it first opened. Id. ¶¶ 7, 10, 45. In April of 2016, Shaan arranged for Lebron to work at the Midland Park Domino's on the weekends to help out. Id. ¶ 5. Plaintiff testified that Lebron would come to the Midland Park Domino's on the weekends to cover for the Assistant Manager of the Midland Park Domino's, Karlin Rosario ("Rosario"), who did not work on Sundays because she was attending school. Pl. Counter SMF ¶ 9.

Plaintiff contends that she was forced by Moises Sanchez ("Sanchez"), the General Manager of the Midland Park Domino's, to drive Lebron home every Sunday when they worked night shifts. Pl. Resp. ¶ 43. Defendants, however, maintain that Sanchez "did not instruct [Plaintiff] to drive Lebron home, and it was not part of her job responsibilities." Defs. SMF ¶¶ 43, 50.

On May 1, 2016, Plaintiff and Lebron were working in the store together. Id. ¶ 6. Plaintiff alleges that Lebron approached her and said that he "was going to f*ck [her] in the walk-in [refrigerator]."[4] Id. ¶ 21. Plaintiff also alleges that Lebron said that he liked how Plaintiff "shaked, how [she] walked through the door," and that he "noticed [she] lost a lot of weight; that [she's]

---

[4] According to Plaintiff's affidavit, she further alleges that "Lebron stepped directly behind [her] so that his penis brushed against [her] buttocks and repeated his previous statement, 'I want to f*ck you in the walk-in.'" ECF No. 76, Kasten Aff. ¶ 9. She also alleges that in the car ride home on May 1, 2016, Lebron acted inappropriately again when he asked her if she would like to "f*ck" him, "strok[ed] his penis with his hands over his pants," and asked her if she "would like him to remove his penis from his pants." Id. ¶¶ 10-14.

looking good, better than before." Id. ¶¶ 22, 24. The parties dispute how Plaintiff reacted to the comments. Id. ¶ 23; Pl. Resp. ¶ 23. Defendants argue that Plaintiff "acted like she heard nothing, and thought that she might have misheard Lebron," Defs. SMF ¶ 23, while Plaintiff maintains that she "explicitly and unequivocally rejected Defendant Lebron's unwelcomed sexual advances" and told him that she "was married and [has] kids" and that she was "not interested [in him]," Pl. Resp. ¶ 23. Plaintiff also contends that Lebron did not take no for answer, and responded to her rejection by saying, "[y]ou'll change your mind"; something Defendants dispute Lebron ever said. Defs. SMF ¶ 23; Pl. Resp. ¶ 23.

Plaintiff contends that on the following day, May 2, 2016, she went to Rosario, her Assistant Manager at the store, and asked her about the proper procedure to file a complaint of sexual harassment because Plaintiff believed Lebron's comments amounted to sexual harassment. Pl. Counter SMF ¶¶ 14-16. According to Plaintiff, in response to her complaint, Rosario "laughed in her face." Id. ¶ 17. Plaintiff found this response to be inappropriate because, as an Assistant Manager, Rosario was one of her supervisors. Id.

Plaintiff asserts that she complained to Sanchez, the General Manager, on May 3, 2016. Id. ¶ 21. Plaintiff maintains that when she was preparing pizza boxes on this day, Sanchez was speaking to someone else on the phone about Lebron—regarding a different matter—and he stated that Lebron was "a good person. He's G[o]d fearing." Id. ¶ 22. As a result of overhearing the conversation, Plaintiff began to cry. Id. Plaintiff then maintains that she told Sanchez "[n]o he's not. He's not a good person. He told me he wanted to f*ck me in the walk-in [refrigerator]." Id. Plaintiff claims that Sanchez defended Lebron, saying "I don't believe that" and "he wouldn't say something like that to anyone." Id. Plaintiff then contends that she requested Sasha Jaconetta's ("Jaconetta") phone number—the District Manager of Shaan—from Sanchez, who did not give it to her, and also asserts that if Jaconetta's number had been posted in the store, she would have

4

called her to report the alleged sexual harassment.[5]  Id. ¶¶ 23-24.  Prior to this incident, Sanchez

had not received any prior complaints of sexual harassment related to Lebron.  Defs. SMF ¶ 40.

The parties dispute what Sanchez did with the information once he received Plaintiff's

complaint about the alleged harassment.  Id. ¶ 39; Pl. Resp. ¶ 39.  Defendants assert that once

Sanchez received Plaintiff's oral complaint, he reported it to Jaconetta.  Defs. SMF ¶ 39.  Plaintiff

avers that per Jaconetta's own testimony, Jaconetta first learned of Plaintiff's sexual harassment

complaint in July of 2016—more than two months after the occurrence of the alleged

harassment—from Mohammed Khan ("Khan"), the owner of Shaan.  Pl. Resp. ¶ 39; Pl. Counter

SMF ¶¶ 76-77.  Therefore, Plaintiff concludes that neither Sanchez (the General Manager) nor

Rosario (the Assistant Manager), informed Jaconetta (the District Manager of Shaan), of Plaintiff's

complaint.  Pl. Resp. ¶ 39.  Plaintiff maintains that Jaconetta stated that, as General Manager,

Sanchez "should have informed [Jaconetta] or somebody in the office" about Plaintiff's sexual

harassment complaint (id.), and that Sanchez should currently be disciplined by Shaan for his

failure to report the complaint, Pl. Counter SMF ¶ 86.[6]

Plaintiff states that on May 8, 2016, a few days after reporting the incident of sexual

harassment to Sanchez, Sanchez released the schedule for the following week.  Id. ¶ 27.  The

schedule had Plaintiff working the night shift on the following Sunday, May 15, 2016.  Id.  Lebron

was not slated to work that day.  Id.  When Plaintiff arrived for her night shift on May 15, 2016,

Lebron was there working; apparently, he was later added to the schedule by Sanchez.  Id. ¶¶ 27,

_____

[5] The Court notes that Plaintiff testified that she could not remember whether Sanchez said "I'm
not giving you the number" or "I don't know the number right now."  ECF No. 71-6, Ex. B, Kasten
Dep. Tr. at 109:17-110:25.

[6] Jaconetta also stated that Rosario should be disciplined for her failure to report Plaintiff's
complaint, but she is no longer an employee of Shaan.  Pl. Counter SMF ¶ 86.

69. Nothing inappropriate occurred between the two *during* their shift.  Id. ¶ 28.  However, on the car ride home—Plaintiff drove Lebron home pursuant to her assertion that management required her to do so—Lebron engaged in "egregious and disturbing sexual harassment."  Id. ¶¶ 29, 30.  Plaintiff recorded the entire car ride, unbeknownst to Lebron.  Pl. Resp. ¶ 42.  Nonetheless, Lebron testified that he has never made inappropriate sexual comments to Plaintiff nor has he ever exposed himself to Plaintiff.  Pl. Counter SMF ¶ 31.  Despite Lebron's testimony, after listening to Plaintiff's recording of the car ride, Rosario identified the voice on the recording as Lebron, and Sanchez and Jaconetta[7] said they believed it was Lebron, but could not be sure.  Id. ¶¶ 52, 64, 83.  Additionally, on the transcript of the recording, Defendants identify the person who Plaintiff is talking to as "Jose Lebron."  *See* ECF No. 71-12, Ex. H.

    In the recording, among other inappropriate comments, Lebron is heard saying "[i]t's motivating when I spend half my workday with raging boners," "[y]ou got a f*ckin' rockin' bod," "God knows I wanna flash the f*ck out of you," "God you are so f*ckin' perfect.  You are perfect, I'm so happy though.  Oh, I'm so gonna jerk the f*ck off right now."  Pl. Counter SMF ¶ 29.  Lebron also apparently removed his penis from his pants and started to masturbate in front of Plaintiff, who refused to watch.  Id.  However, according to Defendants, "[Plaintiff] welcomed, solicited, incited and/or readily invited the conduct about which she now complains."  ECF No. 71-3 at 28.  Defendants argue that "Kasten took it upon herself to drive Lebron home, which was not part of her job duties," that the two only engaged in "playful banter," and that Plaintiff actually encouraged Lebron to make sexually charged comments by telling him her husband was sleeping, giving him her phone number, and discussing private details about her daughters' virginity.  Id. at 29-30.  The recording began with Plaintiff first saying "[h]ere we'll see what happens," and ends

---

[7] Plaintiff notes that Defendants' counsel made "improper speaking objections" with regard to the identification question posed to Jaconetta by Plaintiff's counsel.  Pl. Counter SMF ¶ 83.

with her stating, "I got you."  ECF No. 71-12, Ex. H, Recording Tr. at 1:1-2, 30:20-21.

After May 15, 2016, Plaintiff did not return to work for any of Shaan's Domino's stores. Defs. SMF ¶ 28.  Plaintiff maintains that she called Rosario and resigned because of the "egregious and disturbing sexual harassment" committed against her by Lebron.  Pl. Resp. ¶ 29; Pl. Counter SMF ¶ 30.  Once Plaintiff left Domino's, she did not respond to any calls or texts from that point forward.  Defs. SMF ¶ 51.  As mentioned previously, according to Plaintiff, Jaconetta first learned of Plaintiff's complaint in July of 2016 when she was informed of the allegations by Khan— Shaan's owner.  Pl. Resp. ¶ 39; Pl. Counter SMF ¶¶ 76-77.  Sanchez never addressed Plaintiff's sexual harassment complaints directly with Lebron; Lebron first learned of the complaints made against him in July of 2016.  Pl. Counter SMF ¶ 35.  Lebron testified that he never made any inappropriate sexual comments to Plaintiff nor did he ever expose himself to Plaintiff.  Id. ¶ 31. Lebron was never disciplined in connection with Plaintiff's complaint.  Id. ¶ 78.  Lebron was subsequently terminated from Shaan for an inspection issue while working as the General Manager at Shaan's Passaic Domino's location.  Def SMF ¶ 30.

Defendants contend that Domino's has an employee handbook ("Employee Handbook") that was either handed out physically or was available digitally for all employees, and that as part of the application process, a potential employee must acknowledge that they have read the Employee Handbook.  Id. ¶¶ 31-32.  Though it is undisputed that Plaintiff received initial training regarding how to do her new job (Pl. Resp. ¶ 14), Plaintiff contends that she never received any training "regarding discrimination/harassment policies or any Human Resource issues," and was never provided any Employee Handbook from Jaconetta, Pl. Resp. ¶ 31; Pl. Counter SMF ¶¶ 2, 7. Nevertheless, the Employee Handbook was electronically signed by Plaintiff prior to the alleged

harassment.[8]  Defs. SMF ¶ 52.  The Employee Handbook lays out company policy on all types of

harassment and discrimination, including sexual harassment.  Id. ¶ 53.  One of the relevant portions

is reproduced below:

> If you believe there has been any violation of Domino's Pizza's Equal Employment
> Opportunity Policy or have been subject to harassment, you should register a
> complaint in accordance with the Complaint Procedures set forth within this
> Handbook.  (See Pages 30-31).  Briefly, complaints *should be addressed to your
> store General Manager* and, if for any reason you do not wish to raise your
> complaint with the General Manager, you should address your complaint to the
> District Manager, or in the alternative, Director of Operations or to the President of
> the Company.

Id. (emphasis added).  Defendants also contend that there were strict procedures in place for how

management should react when they received a complaint of sexual harassment or discrimination.

Defs. SMF ¶ 38.  Plaintiff disputes this by pointing to the testimony of Rosario who stated that she

was never trained on how to respond to sexual harassment or discrimination complaints, nor was

she aware of any forms to fill out should an incident arise.  Pl. Resp. ¶ 38.

## II.   <u>PROCEDURAL HISTORY</u>

The Complaint in this action was filed on May 9, 2017.  *See* Compl.  Plaintiff asserts five

claims in the Complaint: 1) discrimination under Title VII of the Civil Rights Act of 1964 ("Title

VII"), as amended, 42 U.S.C. § 2000e *et seq.*; 2) retaliation under Title VII; 3) discrimination

under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.*; 4)

retaliation under the NJLAD; and 5) aiding and abetting under the NJLAD.  *See* Compl.

Defendants filed an Answer on July 28, 2017.  ECF No. 5.  The case was reassigned from another

judge to the undersigned on May 29, 2019.  ECF No. 44.  After this Court sent the parties to

---

[8] The Court notes that on the bottom of the Employee Handbook marked as Exhibit G, it states
that the Employee Handbook was digitally signed "by Mary Kasten on 4/17/2016 at 12:48 PM
EST," not February 1, 2014 as Defendants contend.  *See* ECF No. 71-11, Ex. G, Employee
Handbook.

mediation by Order dated November 5, 2019 (ECF No. 59)—which proved to be unsuccessful—Defendants filed their present motion for summary judgment on June 29, 2020, seeking judgment in their favor as to all counts of the Complaint.  ECF No. 71.

## III.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *see also Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986); Fed. R. Civ. P. 56(c).

The moving party has the initial burden of proving the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-moving party has the burden of identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In order to meet its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (stating that "[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact . . . [the opponent must] exceed[] the 'mere scintilla' threshold.").

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  *Anderson*, 477 U.S. at 248.  A fact is "material" if, under

the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

## IV.   DISCUSSION

### A.   Counts One and Three (Discrimination Under Title VII and the NJLAD)

#### i.   Hostile Work Environment Standard Under Title VII and the NJLAD

Both Title VII and the NJLAD prohibit sexual harassment because it is a form of sexual discrimination. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 601 (1993).[9] Plaintiff's claims of sexual harassment under Title VII and the NJLAD are based on a hostile work environment theory. *See* Compl. Under Title VII, to establish a prima facie case of sexual harassment under the hostile work environment theory, "the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and 5) the existence of *respondeat superior* liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (emphasis in original) (internal citations omitted). To establish a hostile work environment sexual harassment claim under the NJLAD, a plaintiff must show that "the complained-of conduct 1) would not have occurred *but for* the employee's gender; and it was 2) *severe or pervasive* enough to make a 3) *reasonable woman* believe that 4) the

---

[9] "In construing the terms of the [NJ]LAD, this Court has frequently looked to federal precedent governing Title VII . . . as a key source of interpretive authority." *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 600 (1993) (internal citations and quotation marks omitted).

conditions of employment are altered and the *working environment is hostile or abusive*."
*Lehmann*, 132 N.J. at 603-04 (emphasis in original). The parties agree that a discrimination claim under Title VII is subject to the same analysis as a discrimination claim under the NJLAD. *See* ECF No. 71-3 at 22; ECF No. 74 at 18; ECF No. 77 at 4; *see also Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 277 n.7 (3d Cir. 2001) (observing that "any plaintiff who has fulfilled a Title VII prima facie case will also have shown the elements required by the NJLAD"). Defendants argue that the "severe or pervasive" element of Plaintiff's harassment claim is missing and thus contend that there is "insufficient evidence in the record from which a jury could conclude that the conduct alleged was sufficiently 'severe or pervasive' to alter the terms and conditions of Plaintiff's employment and create an objectively hostile work environment actionable under Title VII or the NJLAD." ECF No. 71-3 at 22.

To be considered "severe or pervasive" under Title VII, the harassing conduct must "create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The "severe or pervasive" element is disjunctive; the *harassing conduct* can be either sufficiently severe *or* sufficiently pervasive, it need not be both. *Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 214 n.12 (3d Cir. 2017) (internal citations omitted). A court must analyze the alleged conduct by "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Chinery v. Am. Airlines*, 778 F. App'x 142, 145 (3d Cir. 2019) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (internal quotation marks omitted)). The conduct in question "must be extreme [enough] to amount to a change in the terms and conditions of employment." *Id.* (citing *Faragher*, 524 U.S. at 788); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (reiterating

that the conduct must be sufficiently severe or pervasive that it "alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment").  But first, the Court must address Defendants' argument that the only comments that the Court may consider in its evaluation of the severity or pervasiveness of the alleged conduct here are the three comments that allegedly occurred on May 1, 2016.  *See* ECF No. 71-3 at 26-28.

ii.   Sham Affidavit Doctrine

Defendants argue that because Plaintiff "testified under oath at her deposition that the only comments Lebron made were the three comments . . . on May 1, 2016," her testimony controls and the other allegations of harassment that allegedly occurred on May 15, 2016—that were included in her Complaint and were recorded—should be barred from consideration.  Id. at 26-27. Further, Defendants aver that Plaintiff's attempt to "repudiate" her testimony through a subsequent affidavit should be barred as unreliable per the sham affidavit doctrine.  ECF No. 71-3 at 27-28; ECF No. 77 at 7-8.

The Court finds Defendants' arguments unavailing.  The Third Circuit's articulation of the sham affidavit doctrine is as follows: "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony *without demonstrating a plausible explanation for the conflict*."  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251 (3d Cir. 2007) (emphasis added) (quoting *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)).  The Third Circuit has emphasized that it has adopted "a more flexible approach" with regard to the doctrine as compared to other federal courts.  *Id.* at 254 (internal citations omitted). Thus, when there is "independent evidence in the record to bolster an otherwise questionable affidavit, courts have generally refused to disregard the affidavit."  *Id.* (quoting *Baer*, 392 F.3d at 625).  This type of evidence may establish "that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition."  *Id.* (quoting *Baer*,

392 F.3d at 625). The affiant always has the opportunity to provide a "satisfactory explanation" for the conflict between the deposition and the affidavit. *Id.* (quoting *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)).

The Court declines to apply the sham affidavit doctrine. Plaintiff has explained that she was confused by the question and took it literally to refer to alleged misconduct on a specific day, and therefore did not refer to all of the instances of alleged misconduct that occurred on other days in her response. *See* ECF No. 76, Kasten Aff. ¶ 16. This explanation, when considered in conjunction with the independent record, makes it clear the Court must consider the events that occurred on May 15, 2016. There can be no doubt that Plaintiff believed that she was harassed in the car by Lebron on May 15, 2016; she put forth allegations of it in her Complaint. *See* Compl. ¶¶ 56-66. Further, Plaintiff recorded the entire interaction in the car, a transcript of which has been included in the record. *See* ECF No. 71-12, Ex. H. Accordingly, the Court declines to apply the sham affidavit doctrine, and the alleged harassment that occurred in the car on May 15, 2016 will be considered in the Court's analysis of the alleged conduct.

  iii. <u>"Severe or Pervasive" Analysis</u>

Plaintiff argues that the sexual harassment here was severe or pervasive, or at the very least, Lebron's conduct raises a genuine issue of material fact as to whether such conduct was severe or pervasive, meaning that a reasonable jury could conclude from the record that she was subjected to a hostile work environment. ECF No. 74 at 18-28. Defendants contend that even if the Court includes the alleged conduct from May 15, 2016, Plaintiff cannot recover for any of the alleged harassment because "she welcomed, solicited, incited and/or readily invited the conduct about which she now complains." ECF No. 71-3 at 28-30.

When "looking at all the circumstances," the Court believes that a genuine dispute of material fact exists as to whether Plaintiff was subjected to severe or pervasive harassment.

*Chinery*, 778 F. App'x at 145 (quoting *Faragher*, 524 U.S. at 787-88).  Plaintiff and Lebron only worked together, in total, three or four times.  ECF No. 71-6, Ex. B, Kasten Dep. Tr. at 67:1-5. Out of those times, the alleged harassment occurred twice, and Lebron was serving in some sort of supervisory position in both instances.  Id. at 65:15-66:25, 80:8-81:9 (identifying Lebron as an Assistant Manager and stating that he would come in to replace Rosario on days she had to leave early); ECF No. 71-9, Ex. E, Sanchez Dep. Tr. at 60:25-61:17 (identifying Lebron as a Shift Manager[10]); *see, e.g.*, *Lidwell v. Univ. Park Nursing Care Ctr.*, 116 F. Supp. 2d 571, 582 (M.D. Pa. 2000) ("The comments may not have been great in number, but Lidwell only worked weekends, so that the comments would not have to be as numerous to be a regular occurrence."); *Taylor v. Metzger*, 152 N.J. 490, 503 (1998) ("[T]he severity of the remark in this case was exacerbated by the fact that it was uttered by a supervisor or superior officer.").  Additionally, a reasonable jury could find that the comments and actions allegedly made by Lebron on both May 1 and May 15 of 2016 could be viewed as "physically threatening or humiliating" and beyond a "mere offensive utterance," and that they also could have the effect of unreasonably interfering with Plaintiff's work.  *Chinery*, 778 F. App'x at 145 (quoting *Faragher*, 524 U.S. at 787-88). Among other statements and actions of a sexually charged nature, the evidence suggests that Lebron told Plaintiff that he was "going to f*ck [her] in the walk-in refrigerator," ECF No. 71-6, Ex. B, Kasten Dep. Tr. at 85:19-23, that he liked to work with Plaintiff because he spends half of his "workday with raging boners," ECF No. 71-12, Ex. H, Recording Tr. at 19:5-6, and Lebron apparently even exposed his penis and began to masturbate in front of Plaintiff, Id. at 23:25-26:19, 30:15-19.

---

[10] Sanchez testified that as a Shift Manager, Lebron was still Plaintiff's supervisor.  ECF No. 71-9, Ex. E, Sanchez Dep. Tr. at 62:17-19.

These statements and actions, some of them apparently committed by a supervisor when alone in a car at night, could be interpreted by a reasonable woman as severe sexual harassment. *See Mandel*, 706 F.3d at 167.  The Court believes that the question of whether Plaintiff "welcomed, solicited, incited and/or readily invited the conduct" by using profanity with him and telling him possibly suggestive things (for example, that her husband was sleeping in response to Lebron's statement that he has another hour before he has to get home, and that her daughters were still virgins), is one best left for a jury to assess, as there exists a genuine dispute of fact to this question. *Meritor*, 477 U.S. at 68 ("[T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact.").  The Court also finds that a genuine dispute of material fact exists as to whether Plaintiff was instructed by management to drive Lebron home—especially after she complained to management that she believed she was harassed by Lebron on May 1, 2016.  ECF No. 71-9, Ex. E, Sanchez Dep. Tr. at 86:4-9 (stating that he never instructed Plaintiff to drive Lebron home, but is unsure if others did); ECF No. 71-10, Ex. F, Rosario Dep. Tr. at 49:11-50:15 (stating that no one forced Plaintiff to drive anyone home); ECF No. 76, Kasten Aff. ¶¶ 6, 17 ("Moises said I would need to drive Lebron home . . . since Lebron did not have another way of getting home and we lived near each other.").  Accordingly, because there is a genuine dispute as to whether Lebron's alleged conduct was severe or pervasive, summary judgment must be denied as to Counts One and Three, and it is unnecessary for the Court to discuss the remaining elements of a hostile work environment claim under Title VII and the NJLAD.  *See Paige v. Atrion Comm'n Res., Inc.*, No. 17-00472, 2019 WL 5846799, at *9 (D.N.J. Nov. 7, 2019).

### B.  Constructive Discharge

Plaintiff argues that she was constructively discharged due to Defendants' failure to take any remedial action after she complained to management about Lebron's alleged harassment that

occurred on May 1, 2016.  ECF No. 74 at 29-30.  She avers that this failure to act resulted in her allegedly being subjected to further incidents of harassment by Lebron.  Id.  Defendants contend that Plaintiff's claim that she was constructively discharged must fail as a matter of law because her working conditions were "far from intolerable."  ECF No. 71-3 at 31-34.  Additionally, they contend that they are entitled to an affirmative defense because Shaan had a "readily accessible and effective policy . . . which [Plaintiff] chose not to use."  Id. at 31-33.

Under the NJLAD, a "constructive discharge" occurs when an "employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 27-28 (2002) (internal quotations omitted) (quoting *Muench v. Twp. of Haddon*, 255 N.J. Super. 288, 302 (App. Div. 1992)).  The employee "has the obligation to do what is necessary and reasonable in order to remain employed rather than simply quit."  *Id.* at 28 (internal citations omitted).  When conducting a constructive discharge analysis, courts must consider "the nature of the harassment, the closeness of the working relationship between the harasser and victim, whether the employee resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances."  *Id.* (internal citations omitted).  A constructive discharge claim requires "more egregious conduct than that sufficient for a hostile work environment claim."  *Id.* (internal citations omitted).

The Court finds that genuine issues of material fact exist as to whether the management team of the Midland Park Domino's "knowingly permit[ted] conditions of discrimination," and whether Plaintiff's working conditions were so "intolerable" that they forced her to resign.  *Shepherd*, 174 N.J. at 27-28 (quoting *Muench*, 255 N.J. Super. at 302).  Here, Plaintiff points to evidence in the record that suggests that the management team of the Midland Park Domino's— both Sanchez and Rosario—each failed to act appropriately in response to Plaintiff's complaints,

and it was those failures that resulted in Plaintiff allegedly being sexually harassed for a second time. Plaintiff alleges that upon complaining to Rosario on May 2, 2016, Rosario laughed in response. ECF No. 71-6, Ex. B, Kasten Dep. Tr. at 99:16-100:6. At her deposition, Rosario testified that she was never trained on how to respond to complaints of harassment or discrimination, essentially stating that she would not know how to go about receiving a complaint, and was not aware of any forms she could fill out related to the incident. ECF No. 71-10, Ex. F, Rosario Dep. Tr. at 16:4-17:15.

Rosario also testified that she reported Plaintiff's complaint to Sanchez who then "took it straight into action, [Sanchez] told [Jaconetta]," Id. at 22:13-23:4, but apparently, Sanchez had no recollection of Rosario's report to him, claiming that he never discussed Plaintiff's complaint with Rosario, ECF No. 71-9, Ex. E, Sanchez Dep. Tr. at 91:14-92:21.[11] Additionally, although Sanchez testified that he called Jaconetta—his District Manager—to report Plaintiff's complaint upon his receipt of it, Id. at 27:23-28:3, 34:2-6, Jaconetta testified that the first time she heard about Plaintiff's complaint was in July, 2016, and she was not informed by either Rosario or Sanchez, but rather by Khan, ECF No. 71-8, Ex. D, Jaconetta Dep. Tr. at 29:10-20, 30:25-32:1. Furthermore, when Sanchez was asked why he continued to schedule Plaintiff and Lebron to work together after Plaintiff raised sexual harassment complaints against Lebron, Sanchez essentially stated that he did not believe it was necessary to make changes prior to the conclusion of the investigation. *See* ECF No. 71-9, Ex. E, Sanchez Dep. Tr. at 75:7-11. When asked, "[s]o you *knowingly* allowed someone who had complained of sexual harassment to continue working with the [alleged] sexual harasser, correct?" Sanchez responded, "[y]es." Id. at 83:4-7 (emphasis

---

[11] Jaconetta testified that when a General Manager receives a complaint of sexual harassment, they should document it in writing and immediately contact the District Manager—preferably the day of finding out. ECF No. 71-8, Ex. D, Jaconetta Dep. Tr. at 17:6-18:9.

added).[12]

Defendants, nonetheless, maintain that they had a "detailed and simple policy" to handle sexual harassment complaints, that Plaintiff had actually used the procedures on a previous occasion when she complained to Jaconetta about another Shaan employee, and that rather than using the procedures as provided, Plaintiff bypassed them and resorted to "self-help" by volunteering to drive Lebron home in her car to "set [him] up" and record him.  ECF No. 71-3 at 31-32.  In so arguing, Defendants rely upon *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004).  In *Suders*, the Court held that in response to a claim of constructive discharge, if an employer can show "1) that it had installed a *readily accessible and effective policy* for reporting and resolving complaints of sexual harassment; and 2) that the plaintiff *unreasonably failed to avail herself* of that employer-provided preventive or remedial apparatus," the employer will be entitled to an affirmative defense.  *Id.* at 134 (emphasis added).  Despite Defendants' references to their Employee Handbook and what they term the "accessible and effective policy" on sexual harassment housed within, the potential failures of procedure by the Midland Park Domino's management team highlight issues concerning the policy's effectiveness in its application—at least as applied in Plaintiff's case.  Given the record herein, where Plaintiff contends she attempted to follow the policy in the Employee Handbook by reporting the incident to both of her managers,

---

[12] There is also evidence in the record that demonstrates that Sanchez contradicted his own testimony.  When he was defending his decision not to separate Plaintiff and Lebron on the work schedule after he received Plaintiff's complaint, he stated "[w]hy would I have to do that if my supervisor doesn't tell me to do so, *and the person that is doing the complaint is not showing they are uncomfortable*."  ECF No. 71-9, Ex. E, Sanchez Dep. Tr. at 75:12-76:23 (emphasis added).  But earlier in the same deposition, he stated that when Plaintiff originally complained, "she just made a complaint that *she feels uncomfortable* with what a team member said to her."  Id. at 29:5-11 (emphasis added).  Additionally, according to the testimony, there is no way that his supervisor could have directed him to separate the two, because per Jaconetta, he never reported the complaint to her.  ECF No. 71-8, Ex. D, Jaconetta Dep. Tr. at 31:15-17.

and Defendants assert that she failed to do so and instead resorted to a "self-help" remedy, significant questions remain regarding the policy's effectiveness.  ECF No. 71-6, Ex. B, Kasten Dep. Tr. at 98:2-11, 106:20-108:1.[13]  The Court therefore finds that a dispute of material fact exists as to whether management "knowingly permit[ted] [the] conditions of discrimination" alleged here.  *See Shepherd*, 174 N.J. at 27-28.  In addition, a reasonable jury could surely determine that the alleged harassment that resulted from Defendants' apparent failures, detailed throughout this opinion, was "intolerable" enough to force a reasonable person to resign.[14]  *See id.*; *see also Muench*, 255 N.J. Super. at 302 ("[C]onstructive discharge is a heavily fact-driven determination.") (internal citations and quotation marks omitted).

Lastly, Defendants argue that the Court may not consider the harassment that allegedly occurred on May 15, 2016 in its constructive discharge analysis because Plaintiff never complained to anyone after that incident of harassment occurred, thereby depriving Defendants of the ability to respond.  ECF No. 71-3 at 34; ECF No. 77 at 10.  This is not detrimental to Plaintiff's

---

[13] The Employee Handbook explicitly states that "complaints *should be addressed to your store General Manager*."  ECF No. 71-11, Ex. G, Employee Handbook at 17-18; *see also* id. at 29 (stating that Step 1 of the complaint procedure is to "first discuss your problem with your Store GM").  As stated above, Plaintiff asserts that she reported the incident to her General Manager, but management failed to follow their own procedures.  ECF No. 74 at 29.  Plaintiff could have complained directly to Jaconetta once she was unsatisfied with Sanchez's response—or lack thereof—as Step 2 of the Employee Handbook directs, *see* ECF No. 71-11, Ex. G, Employee Handbook at 29-30, but the record suggests that Jaconetta's number was neither posted in the store, nor did Sanchez provide it to Plaintiff when she asked.  ECF No. 71-6, Ex. B, Kasten Dep. Tr. at 109:17-111:5.  Additionally, Jaconetta apparently did not stop by the store for at least two weeks in May of 2016.  Id. at 112:18-113:9.  Thus, Plaintiff was again scheduled to work with her alleged harasser—and possibly *instructed* to bring him home in her vehicle late at night—which apparently resulted in a subsequent episode of harassment on May 15, 2016, before she had any opportunity to speak with Jaconetta.

[14] Plaintiff notes that Rosario testified that had the alleged comments and conduct been directed at her, "[she] wouldn't continue working there," and that [she] wouldn't feel comfortable in [her] workplace."  ECF No. 71-10, Ex. F, Rosario Dep. Tr. at 29:16-30:7.

claim; Defendants had their opportunity to act after Plaintiff first complained to management on May 2 and May 3 of 2016, they apparently failed, and Plaintiff was allegedly harassed again. Accordingly, Defendants' motion for summary judgment is denied as to Plaintiff's constructive discharge claim.

### C. Counts Two and Four (Retaliation Under Title VII and the NJLAD)

Defendants contend that Plaintiff cannot establish a retaliation claim under either Title VII or the NJLAD because no adverse employment actions were taken by Defendants in connection with Plaintiff's protected activity of complaining to management of the Midland Park Domino's regarding her allegations of sexual harassment. ECF No. 71-3 at 35-36; ECF No. 77 at 12-13. Plaintiff argues that the adverse employment action taken by Defendants here could be either management's failure to adequately address her complaints, or her constructive discharge. ECF No. 74 at 32-34. The Court agrees with Defendants that there are no genuine issues of material fact with regard to whether material, retaliatory employment actions were taken against Plaintiff here. *See Celotex*, 477 U.S. at 323.

To establish "a prima facie case of retaliation under Title VII and the NJLAD, a plaintiff must show that: 1) the employee engaged in a protected activity; 2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and 3) a causal link exists between the employee's protected activity and the employer's adverse action." *Abramson*, 260 F.3d at 286; *see also Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 629-30 (1995) ("[W]e have frequently looked to case law under Title VII . . . for guidance in developing standards to govern the resolution of NJ[LAD] claims."). With respect to the first element, Defendants do not dispute that Plaintiff engaged in a protected activity by reporting her complaints to management. *See* ECF No. 71-3 at 35; *see also* ECF No. 77 at 12.

As for the second element, the Supreme Court has defined a tangible adverse employment

action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) ("[R]etaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment . . . ."), *abrogated on other grounds by Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). It is a plaintiff's burden to show that a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (internal citations and quotation marks omitted).

Here, the Court cannot find that Defendants engaged in a materially adverse employment action by failing to adequately address Plaintiff's complaint. ECF No. 74 at 32-33. Even if the Court assumes that Defendants did fail in this regard, this action alone does not rise to the level of a "*significant change* in employment status" that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Ellerth*, 524 U.S. at 761 (emphasis added); *White*, 548 U.S. at 68 (internal citations and quotation marks omitted). Plaintiff testified that after she complained to Sanchez, she asked him for Jaconetta's number, and if Jaconetta's number had been posted in the store, she would have called her to complain as well. *See* ECF No. 71-6, Ex. B, Kasten Dep. Tr. at 109:17-111:5. Thus, the record indicates that Plaintiff was not "dissuaded from making or supporting a charge of discrimination," and she had every intention of pursuing her claim further if she had the capability to do so. *See White*, 548 U.S. at 68 (internal citations and quotation marks omitted).

Turning to Plaintiff's argument that her constructive discharge constituted Defendants' material adverse employment action, the Court finds the causation element to be too attenuated.

21

The third element of a retaliation claim requires there to be "a causal link . . . between the employee's protected activity and the employer's adverse action." *Abramson*, 260 F.3d at 286.  A plaintiff must ultimately prove "that her employer's retaliatory animus was the cause or, put differently, the 'real reason,' for the adverse employment action." *Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 95 (3d Cir. 2016) (internal citations omitted).  Here, the evidence in the record suggests that Sanchez never told Lebron about Plaintiff's sexual harassment complaint, and thus, Lebron did not become aware of the complaint made against him until July of 2016—almost two months after he allegedly harassed Plaintiff for a second time on the night of May 15, 2016.  ECF No. 71-7, Ex. C, Lebron Dep. Tr. at 37:2-8.  Lebron was therefore not aware that Plaintiff engaged in the protected activity of complaining of his alleged sexual harassment until long after she had allegedly been constructively discharged.  Therefore, the Court finds that Lebron's alleged harassment on May 15, 2016, could not have been executed with the "retaliatory animus" required to make out a retaliation claim under Title VII and the NJLAD.  *Young*, 651 F. App'x at 95 (internal citations omitted).  Defendants' motion for summary judgment is granted with respect to Counts Two and Four of the Complaint, and thus, they are dismissed with prejudice.

### D.  Count Five (Aiding and Abetting Under the NJLAD)

Defendants make two arguments as to why Plaintiff cannot sustain an aiding and abetting claim.  First, they argue that Plaintiff has not named another individual as a defendant in this matter other than Lebron, thereby making it is impossible to establish aiding and abetting liability.  ECF No. 71-3 at 37-38.  Second, they argue that Lebron can only be liable if he committed actions that were in violation of the NJLAD, which they argue there is no evidence of here.  ECF No. 77 at 14.  Plaintiff contends that it is well established that individual supervisors can be liable for aiding and abetting their own conduct under the NJLAD, and thus, Lebron may be held individually liable for aiding and abetting his own alleged harassment.  ECF No. 74 at 34-36.  The Court agrees with

Plaintiff.

It is well established in this Circuit that individuals serving in a supervisory role can legally aid and abet their own conduct. *See Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 126 (3d Cir. 1999) (holding that when a supervisor engages in "affirmatively harassing acts," he "flouts [his] duty" and "subjects himself and his employer to liability"); *see also O'Toole v. Tofutti Brands, Inc.*, 203 F. Supp. 3d 458, 467 (D.N.J. 2016) ("In addition, courts construe the aiding and abetting theory broadly, such that an individual supervisor can aid and abet his own conduct."); *Williams v. Twp. of Lakewood*, No. 17-11401, 2020 WL 7391009, at *21 (D.N.J. Dec. 15, 2020); *Rowan v. Hartford Plaza Ltd.*, No. A-0107-11T3, 2013 WL 1350095, at *8 (N.J. Super. Ct. App. Div. Apr. 5, 2013) ("Based on the broad and pervasive reach of the [NJ]LAD, and the requirement that it be liberally construed to effectuate its purpose, any suggestion that N.J.S.A. 10:5–12(e) permits individual liability for a supervisor who encourages or facilitates another employee's harassing conduct, while precluding individual liability for the supervisor based on his or her own discriminatory or harassing conduct, appears to us to be untenable.") (internal citations and quotation marks omitted).  The record indicates that Lebron was serving in a supervisory role during his time at the Midland Park Domino's, therefore making him susceptible to liability under this provision of the NJLAD.  ECF No. 71-6, Ex. B, Kasten Dep. Tr. at 65:15-66:25, 80:8-81:9 (identifying Lebron as an Assistant Manager and stating that he would come in to replace Rosario on days she had to leave early); ECF No. 71-9, Ex. E, Sanchez Dep. Tr. at 60:25-61:17, 62:17-19 (identifying Lebron as a Shift Manager).  Therefore, there is no need for Plaintiff to name another individual as a Defendant; her aiding and abetting claim is targeted at Lebron, an individual serving in a supervisory role who is already named as a Defendant.

As for Defendants' second argument, it has been discussed repeatedly throughout this opinion that there exists a genuine dispute of material fact as to whether Lebron has violated the

NJLAD by his alleged conduct, and the Court has denied Defendants' motion for summary judgment as to that claim under the NJLAD (Count Three).   Accordingly, the Court denies Defendants' motion for summary judgment as to this Count as well.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for summary judgment is **GRANTED in part** and **DENIED in part**.  An appropriate order accompanies this opinion.


DATED: February 26th, 2021

_____

**CLAIRE C. CECCHI, U.S.D.J.**

24